**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 06-70948-JAD |
| | ) | |
| SCOTT B. WINGARD and | ) | Chapter 13 |
| SHARON A. WINGARD, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | X | |
| | ) | |
| SCOTT B. WINGARD and | ) | Adversary No. 07-07038-JAD |
| SHARON A. WINGARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ALTOONA REGIONAL HEALTH | ) | |
| SYSTEMS and CREDIT CONTROL | ) | |
| COLLECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | X | |

Appearances:     Mary K. Wheeler, Esquire, for the Plaintiffs
                 A. Thomas Farrell, Esquire, for the Defendants

**MEMORANDUM OPINION**

This Memorandum Opinion constitutes the Court's findings of fact and

conclusions of law pursuant to Fed. R. Bankr. P. 7052.  The matter before the

Court is an Adversary Proceeding commenced by Scott and Sharon Wingard (the

"Wingards" or the "Debtors") against both Altoona Regional Health Systems and

its agent and debt collector, Credit Control Collections ( the "Defendants").  This

00001907.WPD

matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G), and (O), and this Court has jurisdiction over the instant matter pursuant to 28 U.S.C.§ 1334(b).

## I.

Pursuant to the Adversary Complaint, the Plaintiffs request that the Court require the Defendants to pay compensatory damages to the Wingards as a result of the Defendants' alleged willful violation of the automatic stay. The alleged violation of the automatic stay is actually multiple violations of the stay; and consists of the Defendants' mailing of at least two computer generated dunning letters, and perhaps at least one telephone call, to the Debtors despite knowledge of the pendency of the Wingards' bankruptcy filing. The injury to the Debtors caused by these collection efforts is primarily in the form of emotional distress, anguish and anxiety.

Given this context, the issues presented in this case are two-fold. The first issue is: "Are the Defendants' violations of the automatic stay willful?" Stated in other words: "Can the Defendants hide behind 'the computer did it' defense to avoid a finding that their conduct was sufficiently willful for purposes of 11 U.S.C. § 362(k)(1))?" The second issue is: "If the respondents have willfully violated the automatic stay, are the Debtors entitled to a remedy in the form of compensatory damages, and reimbursement of attorneys fees and costs, when the injuries they sustained are primarily in the form of emotional distress, anguish and anxiety?"

As set forth more fully below, the Court rejects "the computer did it"

defense, and concludes that the Defendants have in-fact committed a willful violation of the automatic stay.  This Court also concludes that psychological injury, beyond "fleeting or trivial anxiety or distress," could form the basis of a monetary award in favor of a debtor under 11 U.S.C. § 362(k)(1) when the creditor's stay violation is not egregious.  However, because the stay violations were not egregious, and because the Plaintiffs' in this case have failed to demonstrate that they have suffered significant emotional harm or anxiety, the Court concludes that the Plaintiffs' injuries do not support the imposition of damages against the Defendants pursuant to 11 U.S.C. § 362(k)(1).

## II.

On February 22, 2008, the Court conducted a half-day trial on the merits of the Plaintiffs' complaint.  During the course of the evidentiary hearing, it became apparent that many of the facts in this case are not in dispute.

The Plaintiffs, Scott B. Wingard and Sharon A. Wingard, are husband and wife residing in Altoona, Pennsylvania. (*See* Docket #1 - Voluntary Petition)[1]  Mr. Wingard is a night dispatcher at Imler's Poutry and Ms. Wingard is employed at Burger King. (*Id.* - Schedule I)

This bankruptcy case was commenced by the Plaintiffs filing a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on November 21, 2006.  In connection with the bankruptcy filing, the Wingards filed schedules

---

[1] The Court takes judicial notice of the various pleadings and admissions on file in this case.

identifying, among other things, all of their creditors. (*Id.* - Schedules D, E, and F.)  As of the petition date, the Wingard's had some unpaid medical bills to Altoona Regional Health Systems in an amount equal to at least $150.00 and this creditor was duly listed on the Debtors' schedules. (*Id.*)  In addition, the creditor's debt collector known as "Central Credit Audit" was also listed in the schedules for notice purposes. (*Id.*).

A meeting of creditors was duly scheduled during the ordinary course of the administration of this bankruptcy case, and a "Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors & Deadlines" was duly served by the Clerk of the Court (through the Bankruptcy Noticing Center) on December 10, 2006 upon Altoona Regional Health Systems and its debt collector Central Credit Audit. (*See* Docket #16 - BNC Certificate of Mailing).

At trial, the Defendant's president and shareholder, Mr. Steven Lewis testified.  He testified that Credit Control Collections is in the business of collecting receivables, including health care receivables like the one owed to Altoona Regional Health Systems.  He further testified that subsequent to the Wingard's bankruptrcy, Credit Control Collections replaced Altoona Regional Health Systems's "first-line collection agency" and inherited the collection work for the debt due Altoona Regional Health Systems.

The evidence adduced at trial is that when Credit Control Collections inherited the collection work, a "letter" from the Court- presumably the "Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors & deadlines"- was included in

the documentation provided to Credit Control Collections.  Thus, it appears that at all times material hereto the Defendants have had actual knowledge of the Wingards' bankruptcy case.

Mr. Lewis also testified that Credit Control Collections has a process in place which usually prevents his firm from collecting bankrupt accounts.   The process is that when his firm receives notice of a bankruptcy, the notice is usually disseminated in his office and the bankruptcy is noted in his firm's computer system.  Specifically, Mr. Lewis' testimony reveals that his office is apparently relatively small in that he personally picks up the mail every day; on average his office receives 2 to 3 bankruptcy notices per day; and he provides the notices to a Collections Supervisor (who then inputs the bankruptcy data into Credit Control Collections' computer system).

Once the Collections Supervisor at Credit Control Collections inputs the bankruptcy data into the computer system, the account is flagged.   In the ordinary case, once the account is flagged no phone calls are made by Credit Control Collections against debtors in bankruptcy; and no dunning letter work is further outsourced by the company.  However, in the Wingard matter, Mr. Lewis testified that the Wingard's bankruptcy filing inexplicably "fell through the cracks" because the notice of the bankruptcy was not noted on Credit Control's computer system.  As a result,  Credit Control Collections sent a dunning letter dated March 29, 2007 to the Plaintiffs, and demanded payment of the $150.00 sum due Altoona Regional Health Systems.

Both Mr. and Mrs. Wingard testified at trial as well. They testified that when the first dunning letter was received, they forwarded it to their counsel. Counsel then assured the debtors that they were protected by the automatic stay, and wrote a letter dated May 21, 2007 to Credit Control Collections advising it of the bankruptcy and of the fact that "[a]ny further attempts at collection will be answered for a motion for violation of the automatic stay." This letter also "fell through the cracks" at Credit Control Collections.

Mrs. Wingard also testified that on at least one occasion her residence received a phone call, which was ultimately traced back to Credit Control Collections.[2] Both Mr. and Mrs Wingard also testified that despite their counsel's letter of May 21, 2007, Credit Control Collections sent another dunning letter demanding payment from the debtors. This time, the second letter was sent on July 3, 2007.[3] Thus, it appears to the Court that the Defendants have committed three knowing violations of the automatic stay. The first being the letter of March 29, 2007, the second being the phone call, and the third being the letter of July 3, 2007.

At trial the Wingards testified that the continued collection efforts by

---

[2] Mrs. Wingard testified that her home had received several "hang-up" calls of unknown origin. As to the one call attributed to Credit Control Collections, the caller apparently did not state the reason for the call or from which company she was calling. Instead, she merely left her name and a phone number. After Mrs. Wingard conducted an internet search, she determined that the phone number of the woman was the phone number of Credit Control Collections. The Defendants dispute Mrs. Wingard's testimony and contend that no phone calls were made by Credit Control Collections. The Court, however, finds Mrs. Wingard's testimony to be credible and, as a result the Court finds that Credit Control Collections had made at least one phone call to the Wingards in violation of the automatic stay.

[3] The July 3, 2007 letter states, among other things: "Protect your credit . . . pay in full at once!"

Altoona Regional Health Systems (through its agent, Credit Control Collections) added additional emotional stress on the debtors.  Examples of the emotional distress cited by Mr. Wingard included the fact that he could not sleep well, he woke up nightly worrying about creditors, and he had elevated blood pressure. His testimony was that while he had such conditions before the bankruptcy filing, they were worsened to a certain degree post-petition because of the fact that  he had to continue to worry about his creditors.  He also testified that while the debtors' financial problems have historically caused friction in his marriage with Mrs. Wingard, the collection efforts of the Defendants did not aid the debtors' efforts towards obtaining a fresh start in that regard either.  Specifically, Mr. Wingard testified that when the debtors received the call and letters from Credit Control, Mrs. Wingard would then call Mr. Wingard at work thereby causing Mr. Wingard additional stress on the job.

Mr. Wingard's testimony was corroborated by the testimony of Mrs. Wingard.  Mrs. Wingard also testified that the continued collection activity caused her emotional distress.   Physical manifestations of her distress included: problems  sleeping; an upset stomach; difficulty eating; and irritation at work. However, like Mr. Wingard, the debtor never had her emotional distress treated by a psychologist or physician; and neither debtor missed work (except to appear at the hearing) as a result of the collection activities by, or on behalf of, the Defendants.   In addition, at trial the Plaintiffs did not offer any further corroborating evidence of their emotional distress as no witnesses other than the

Wingards were offered in support of the Plaintiffs' claims of injury.

Given the circumstances of this case, the Wingards inquired with counsel on a few occasions as to whether they were in-fact protected by the automatic stay.  Given the fact that the Defendants sent another dunning letter despite a formal letter from counsel, counsel for the Wingards commenced this Adversary Proceeding seeking (a) damages for the Defendants' violation of the automatic stay, and (b) for "such other relief" the Plaintiffs may be entitled.

## III.

A fundamental protection afforded by the Bankruptcy Code is the "automatic stay," which originates by application of 11 U.S.C. § 362(a).[4] In re University Medical Center, 973 F.2d 1065, 1074 (3d Cir. 1992);  In re Williams, 371 B.R. 102 (Bankr. E.D.Pa. 2007).   The "automatic stay" is a statutory injunction arising upon the commencement of the case; and the injunction is "automatic" in that it arises without the necessity of a formal court order.

The automatic stay "is designed to effect an immediate freeze of the *status quo* . . . and protects the debtor by allowing it breathing space and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others." Hillis Motors, Inc. v. Hawaii Auto.

---

[4] Section 362(a) of the Bankruptcy Code states, in pertinent part, as follows:

(a) . . . a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of- . . .
        (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; . . .

11 U.S.C. § 362(a)(6).

Dealers' Ass'n, 997 F.2d 581, 585 (9th Cir. 1993) (citing Interstate Commerce

Comm'n v. Holmes Transp., Inc., 931 F.2d 984, 987 (1st Cir. 1991), vacated, 983

F.2d 1122 (1st Cir. 1993) and Treasurer of Snohomish Cty., Wash. v. Seattle First

Nat'l Bank (In re Glasply Marine Indus.), 971 F.2d 391, 394-95 (9th Cir. 1992)); *see*

*also* In re University Medical Center, 973 F.2d at 1084.  The automatic stay is an

important and powerful bankruptcy remedy in that it precludes certain post-

petition actions of creditors, including the efforts of creditors to obtain property

of the debtor or property of the bankruptcy estate.  See 11 U.S.C. §§ 362(a)(1),(2),

(3), (4), (5), and (6). As stated in the legislative history of Section 362(a) of the

Bankruptcy Code, the stay:

> . . . gives the debtor a breathing spell from his creditors.
> It stops all collection efforts, all harassment, and all
> foreclosure actions.  It permits a debtor to attempt a
> repayment or reorganization plan, or simply be relieved
> of the financial pressures that drove him into
> bankruptcy.

*See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1978), *reprinted in* 1978

U.S.C.C.A.N. 5787, 5963, 6296-97.

The importance of the automatic stay in our system of bankruptcy is

reflected in the provisions of Section 362(k)(1) of the Bankruptcy Code.  This

aspect of the statute holds creditors accountable for injuries caused by willful

violations of the automatic stay.  Section 362(k)(1) of the Bankruptcy Code is

remarkably simple, and states in pertinent part as follows:

> . . . an individual injured by any willful violation of a stay
> provided by this section [i.e., Section 362(a)] shall

> recover actual damages, including costs and attorneys'
> fees, and, in appropriate circumstances, may recover
> punitive damages. . . .

11 U.S.C. § 362(k)(1).[5]  Thus it appears that the provisions of the statute come

into effect upon the Wingards showing that: (1) a violation of the automatic stay

has occurred; (2) the violation was willful; and (3) the willful violation has caused

injury to the debtors.[6]

## IV.

There is no dispute in this case that the collection activities of the

---

[5]  This statutory provision was previously codified in Section 362(h) of the Bankruptcy Code. *See* 11 U.S.C. § 362(h)(1984).  However, when Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005, Congress re-codified former Section 362(h) at Section 362(k) and added a safe harbor for lessors of personal property who repossess collateral under some limited circumstances. *See* 11 U.S.C. § 362(k)(2)(2005).  The case before this Court does not fall within the safe harbor provisions of 11 U.S.C. § 362(k)(2).  In addition, because the provisions of Section 362(k)(1) mirror the old provisions found in former Section 362(h), caselaw addressing the application of Section 362(h) is relevant to the Court's application of Section 362(k)(1) in this case.

[6]  In In re Clayton, 235 B.R. 801 (Bankr. M.D.N.C. 1998), the bankruptcy court noted:

> There is some difference of opinion among the courts regarding the proper standard of evidence to be used in an action to impose sanctions under § 362(h) [which has now been re-codified at § 362(k)(1)].  A minority of courts have held that the proper standard is one of clear and convincing evidence.  *See, e.g.,* Diviney v. NationsBank of Texas (In re Diviney), 211 B.R. 951, 961 (Bankr. N.D. Okla. 1997); Brockington v. Citizens and S. Nat'l Bank of S.C. (In re Brockington), 129 B.R. 68, 70 (Bankr. D.S.C. 1991).  However, the majority of courts rely on the Supreme Court's language in Grogan v. Garner for the position that the preponderance of the evidence standard is more appropriate in this context.  "Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed. 755 (1991).

In re Clayton, 235 B.R. at 806-807.  Like the court in In re Clayton, this Court agrees that the debtors' standard of proof is the preponderance of the evidence standard.

Defendants violated the automatic stay.[7]  The issue before the Court is whether the violations were willful.

Credit Control Collections contends that their collection activity does not rise to the level of willful conduct which would trigger the application of Section 362(k)(1) of the Bankruptcy Code.  In support of their defense, the Defendants contend that notice of the Wingards' bankruptcy innocently "fell through the cracks" and that the willful nature of their conduct is vitiated by the fact that the "computer did it"- namely, that Credit Control Collections' automatic system of sending dunning letters is the culprit.  The Court rejects these defenses.

With respect to the concept of "willfulness," the Third Circuit Court of Appeals has held:

> It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed.  In re University Medical Center, 973 F.2d 1065, 1087-88 (3d Cir. 1992).  Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional. Id.

In re Landsdale Family Restaurants, Inc., 977 F.2d 826, 829 (3d Cir.  1992).  Application of this standard to the facts of this case leads to the inescapable conclusion that the Defendants have willfully violated the automatic stay.

It is undisputed that, at all times material hereto, the Defendants have had

---

[7]  For the sake of clarity, there is no dispute in this case that at all times material hereto that Credit Control Collections was an authorized agent of Altoona Regional Health Systems.  As such, there is no dispute in this case that each of the Defendants are jointly and severally liable for the damages, if any, caused by the stay violation at issue.

knowledge of the pendency of the Wingards' bankruptcy case.  In fact, notice of commencement of the case was sent from the Court to Altoona Regional Health Systems on December 10, 2006,[8] and such notice was contained in the file inherited by Credit Control Systems.

Despite the existence of actual notice of the bankruptcy file, what exactly did the Defendants do?  The answer is simple.  They caused at least one phone call to be made and initially one dunning letter to be sent.  These are in fact intentional acts, even if they were done with the mistaken belief that the Wingards were not subject to bankruptcy protection.  The Court reaches this conclusion because in order to make a phone call, someone has to pick up the phone and talk into it.  The Court also reaches this conclusion because in order to send a dunning letter, someone has to enter into the computer the name and account information of the debtors.  This is common sense; and the Court finds that these activities were done and they were intentional.

Recognizing this, Credit Control Collections seeks to hide behind the "computer did it defense" by claiming that the Wingards' bankruptcy information "fell through the cracks."  The Court does not find this defense to be credible.

---

[8]  The Defendants' have not disputed actual notice of the bankruptcy case.  Even if they had disputed notice of the bankruptcy filing, the law is that a debtor may rely on the court's certificate of mailing to invoke a presumption of receipt of notice. *See, e.g.*, In the Matter of Robinson, 228 B.R. 75, 81 (Bankr. E.D.N.Y. 1998).  The docket in this case reflects that Altoona Regional Health Systems and its first-line credit collector Central Credit Audit received a myriad of other bankruptcy notices throughout this case.  For example, on February 24, 2007 they were served with a copy of the Order Confirming Chapter 13 Plan and Setting Deadlines (*see* Docket #22); on May 19, 2007 they were served with the notice of order setting date certain for the debtors to file an amended plan (*see* Docket # 26); and on June 28, 2007, the debtors served them with a copy of an amended Chapter 13 Plan (*see* Docket #33).  In response to these notices, did Altoona Regional Health Systems halt its collection activity?  No it did not.

How many times can a bankruptcy file "fall through the cracks?"  Maybe when Credit Control Collections inherited the collection work from the first-line collection agency an employee failed to properly review the file.  It is true, mistakes do happen.   However, after the first dunning letter was sent, Credit Control Collections received a cease and desist letter from counsel to the Wingards.  What did Credit Control Collections do with this letter?  The answer is send another dunning letter demanding that the debtors "Protect your credit . . . pay in full at once!"  This response by Credit Control Collections was inadequate, and as such the Defendants bear the risk of loss with respect to the possibility of bankruptcy notices "falling through the cracks."

As to the "computer did it" defense, this Court rejects it as well.  As a legal matter, the "computer did it" defense has been rejected by other courts, *see* In re Rijos, 263 B.R. 382, 392 (B.A.P. 1ˢᵗ Cir. 2001); McCormack v. Federal Home Loan Mortgage Corp. (In re McCormack), 203 B.R. 521, 523-525 (Bankr. D.N.H. 1996), and those court opinions are well reasoned and thorough.  This Court agrees with the observations of Bankruptcy Judge Yacos in that the "computer did it" defense is a "nonstarter . . . since intelligent beings still control the computer" and are thus responsible for their errors. In re McCormack, 203 B.R. at 524.  As Judge Yacos noted, creditors "have a clear obligation to adjust their programming and procedures and their instructions to employees to handle complex matters correctly." Id. at 525.  This obligation includes ensuring that bankruptcy notices do not improvidently get lost, go missing or get destroyed.

Because the Defendants' acts were intentional, and were done at a time when they had actual knowledge of the Wingards' bankruptcy filing, the Court concludes that the Defendants have willfully violated the automatic stay.[9]

## V.

Even though the Defendants have willfully violated the automatic stay, the Defendants argue that the damage provisions of Section 362(k)(1) have not been triggered. In support of their position, the Defendants challenge the Plaintiffs' claim that they have been injured by the Defendants' collection activity.

No doubt exists in this case that the Wingards suffered no documented physical injury to their person or property as a result of the Defendants' willful violation of the automatic stay. Based on the record made before the Court, the Wingards' injury, if it exists, is in the form of psychological injury and inconvenience in dealing with the dunning letters and phone call of the Defendants.

The issue therefore before the Court is whether the complainant of a willful stay violation may recover damages if the injury is merely emotional distress- as opposed to physical injury to the person or to his or her property? A secondary

---

[9] In reaching this conclusion, the Court also rejects the Defendants reliance upon the "bona fide error" defense found in the Fair Debt Collection Practices Act. *See* 15 U.S.C. § 1692k©). The Court reaches this conclusion because the "bona fide error" defense relates solely to an "action brought under" Section 1692 of title 15, and not to violations of 11 U.S.C. § 362(a). While it is true that certain actions in violation of the stay may also give rise to a cause of action under the fair Debt Collection Practices Act, the Court has not found any reported decision which suggests that the "bona fide error" defense set forth in title 15 is applicable to a cause of action brought pursuant to 11 U.S.C. § 362(k)(1). Indeed, at trial when the Court asked counsel to cite any case for that proposition, counsel was not able to do so, and merely cited the Landsdale case cited in the body of this Memorandum Opinion. The Landsdale case, however, makes no mention of the Fair Debt Collections Practices Act.

issue relates to the type of evidence that a complainant must produce in order to support a claim of emotional distress under 11 U.S.C. § 362(k)(1).  Namely, under what circumstances must the complainant introduce extrinsic objective evidence- beyond mere self-serving testimony of the debtors- to support proof of psychological injuries?  Each of these issues are addressed *ad seriatim* below.

### A.

Some courts have held that emotional distress injuries are not compensable absent some corresponding financial injury to the individual harmed by the stay violation.  *See*, *e.g.*,   Aiello v. Providian Fin. Corp., 239 F.3d 876 (7th Cir. 2001)(debtors can only "piggyback" claims for emotional distress if they have suffered financial injuries).  These courts reason that the primary focus of the automatic stay is to protect financial interests of the debtor; and absent an injury to such financial interests, relief in the form of compensatory and punitive damages is not justified.  Id. at 879 (stating that the automatic stay is "financial in character: it is not protection of peace of mind"). [10]

However the text of Section 362(k)(1) of the Bankruptcy Code lends itself to the opposite conclusion because the language of the statute is quite broad.  It states that an "individual injured [by the willful stay violation]. . . shall recover

---

[10]  It is noted that there is a split of authority regarding the issue of whether an award of attorneys fees and costs under 11 U.S.C. § 362(k)(1) is an independent matter from the issue of actual damages or if the award of attorneys' fees and costs  is conditioned upon the showing of actual injury.  In re Rijos, 263 B.R. at 390 (*Comparing* In re Peterkin, 102 B.R. 50, 54 (Bankr. E.D.N.C. 1989) *with* Lovett v. Honeywell, Inc., 930 F.2d 625, 629 (8th Cir. 1991); In re Hen House Interstate, Inc., 136 B.R. 220, 223 (Bankr. E.D. Mo. 1992); In re Haan, 93 B.R. 439, 441 (Bankr. W.D.N.C. 1988)).  The Court, however, need not address this issue because the Wingards have not incurred any fees or costs  in this matter as counsel has undertaken the prosecution of this Adversary Proceeding on a purely contingent basis.

actual damages, " 11 U.S.C. § 362(k)(1),  and the statute does not exclude from

its coverage the right of those whose injuries are not physical in nature to seek

redress.  The plain reading of the statute therefore supports the conclusion that

emotional distress damages standing alone could form a basis of recovery under

Section 362(k)(1) of the Bankruptcy Code.

The legislative history to the statute also supports the notion that emotional

distress damages could be compensable under 11 U.S.C. § 362(k)(1).  In In re

Dawson, 390 F.3d 1139 (9th Cir. 2004), the Ninth Circuit Court of Appeals

provided an expansive summary of the statute's legislative history, including

lengthy passages from the House Report supporting the statute.[11]  The House

Report states, among other things, that:

> The stay is the first part of bankruptcy relief, for it gives
> the debtor a respite from the forces that led him to
> bankruptcy.  Frequently, a consumer debtor is severely
> harassed by his creditors when he falls behind in
> payments on loans.  The harassment takes the form of
> abusive phone calls at all hours, including at work,
> threats of court action, attacks on the debtor's
> reputation, and so on.  The automatic stay takes the
> pressure off the debtor.

In re Dawson, 390 F.3d at 1148 (quoting H.R.Rep. No. 95-595, at 125-26,

reprinted in 1978 U.S.C.C.A.N. 5963, 6086-87 (footnote omitted)).

The preceding passage in the House Report contains a footnote that directs

the "reader to an Appendix in which a lawyer for the Federal Trade Commission

---

[11]   Again, the statute was initially codified at 11 U.S.C. § 362(h)(1984), and the statute has since been re-codified in BAPCPA at 11 U.S.C. § 362(k)(1)(2005).

further detailed abuses to which consumer creditors are frequently subjected." Id.

at 1148. The Appendix also states, among other things, the following:

> The consumer who seeks the relief of a bankruptcy court
> is an individual who is in desperate trouble. . . . The
> short term future that he faces can literally destroy the
> basic integrity of his household. We believe that this
> individual is entitled to a focused and compassionate
> effort on the part of the legal system to alleviate
> otherwise insurmountable social and economic
> problems. We believe that relief should be provided with
> fairness to all concerned but with due regard to the
> dignity of the consumer as an individual who is in need
> of help.

Id. (citing H.R.Rep. No. 95-595, at 173, *reprinted in* 1978 U.S.C.C.A.N. 5963,

6134)).

With this legislative history, the Ninth Circuit Court of Appeals

observed in In re Dawson:

> Through the automatic stay, Congress was furthering
> more than one goal. We have explained that "[t]he
> purpose of the automatic stay provision is two-fold. By
> halting all collection efforts, it gives the debtor a
> breathing spell from his creditors during which the
> debtor can try to reorganize. By preventing creditors
> from pursuing, to the detriment of others, their own
> remedies against debtors' property the stay protects
> creditors." United States v. Dos Cabezas Corp., 995 F.2d
> 1486, 1491 (9th Cir. 1993)(alteration and internal
> quotation marks omitted). Under that formulation the
> stay's "two-fold" purpose, id., is not merely debtors *and*
> creditors; the stay also is meant to achieve financial *and*
> non-financial goals. Plainly one aim of the automatic
> stay is financial: the stay gives the debtor time to put
> finances back in order, offers the debtor an opportunity
> to reorganize so that creditors can be satisfied to the
> greatest extent possible, and prevents creditors from
> racing to devour the debtor's estate at the expense of

> fellow creditors.   But another purpose is to create a
> "breathing spell," <u>id.</u>, a phrase suggesting a human side
> of the bankruptcy process.

<u>In re Dawson</u>, 390 F.3d at 1147.  Given this "human side" of the Bankruptcy

Code,[12] the Ninth Circuit Court of Appeals concluded that emotional distress

injuries are compensable for willful violations of the automatic stay.

This Court agrees with the <u>Dawson</u> Court, and the Court's decision in this

regard is particularly acute given the plain language of 11 U.S.C. § 362(k)(1).

## B.

Given the fact that the Court has concluded that the Defendants have

willfully violated the automatic stay, and given the fact that the Court has

concluded that psychological injury is one of the types of injuries compensable

under 11 U.S.C. § 362(k)(1), the Court now turns its attention to whether the

Wingards have proven that they were injured by the Defendants' conduct.

The case law in this area provides that when the willful violator of the

automatic stay has engaged in conduct that is patently or obviously egregious,

emotional distress injuries may be proven merely by credible debtor testimony

alone without resort to other extrinsic and corroborating evidence.  For example,

the Bankruptcy Court for the Eastern District of Pennsylvania in <u>Wagner v. Ivory</u>

<u>(In re Wagner)</u>, 74 B.R. 898 (Bankr. E.D. Pa. 1987) awarded the debtor emotional

distress damages when the creditor in that case broke into the debtor's house and

---

[12]  The "human side" of bankruptcy is further evident by the fact that the damages provisions of 11 U.S.C.
§ 362(k)(1) are available only to "individuals."

threatened to "blow [the debtor's] brains out." In re Wagner, 74 B.R. at 900.

In another case, In re Carrigan, 109 B.R. 167 (Bankr. W.D.N.C. 1989), the creditor was sanctioned $1,000 as a result of his offensive conduct.  In In re Carrigan, the creditor appeared at the debtor's home one evening and demanded that the debtor pay him "money right now . . . or your going to regret it." In re Carrigan, 109 B.R. at 168.  The creditor also swore at the debtor.  When the debtor told the creditor to contact the debtor's bankruptcy lawyer, the creditor replied, "who that [expletive] . . . I don't want to talk to that son of a [expletive], I want my money." Id.  Because the creditor's conduct was personal, flagrant and profane, "played out on the debtor's doorstep at night on the Sabbath, and wholly without excuse," the court deemed the debtor entitled to damages for all of the "great fear, stress and anxiety"  suffered as a result of the creditor's conduct. Id.

Another example of a case where psychological injury was proven without resort to extrinsic corroborating evidence is Fisher v. Blackstone Financial Services, Inc. (In re Fisher), 144 B.R. 237 (Bankr. D. R.I. 1992).  Here the creditor accused  the debtor of criminal conduct.  The creditor then repossessed the debtor's automobile immediately after the meeting of creditors despite the fact that the bankruptcy trustee and debtor's counsel informed the creditor that such conduct was unlawful. In re Fisher, 144 B.R. at 238-239.

In instances where the complained of conduct is not patently or obviously egregious, courts have required that debtors meet a three (3) part test before being eligible to recover damages from a willful violator of the automatic stay.  To that

end, courts have held that to be entitled to damages for emotional distress, the

injured party must:

1.    Suffer significant harm;

2.    Clearly establish the significant harm (i.e., prove it with reasonable
certainty and mere speculation, guess or conjecture will not suffice);
and

3.    Demonstrate a causal connection between the significant harm and
the violation of the automatic stay (as distinct from the anxiety and
pressure inherent in the bankruptcy process).

In re Dawson, 390 F.3d at 1149.

With respect to the establishment of significant harm in the so-called non-

egregious cases, courts have required that debtors prove emotional distress

through the introduction of corroborating extrinsic evidence beyond mere self-

serving testimony of the complainant.  For example, in Diviney v. Nationsbank of

Texas (In re Diviney), 211 B.R. 951 (Bankr. N.D. Okla. 1997),[13] the court held that

damages for emotional distress were not warranted where the emotional distress

seemed trivial and no medical evidence was introduced which corroborated the

claim. In re Diviney, 211 B.R. at 967.[14]

In fact, "[t]he majority of the courts have denied damages for emotional

_____

[13] In Diviney, the court used the "clear and convincing" burden of proof.  This aspect of Diviney was
abrogated by the Tenth Circuit Court of Appeals in Johnson v. Smith (In re Johnson), 502 F.3d 1163 (10th Cir. 2007),
where the court held that the burden of proof was the "preponderance of the evidence" standard. In re Johnson, 502
F.3d at 1169-71.

[14] The corroborating evidence need not necessarily be medical evidence from a treating physician because
some debtors may be reluctant to miss work or are uninsured or underinsured; and as a result they do not seek
medical treatment.  "Non-experts, such as family members, friends, or co-workers may testify to manifestations of
mental anguish and clearly establish that significant emotional harm has occurred." In re Dawson, 390 F.3d at 1149
(citing Varela v. Ocasio (In re Ocasio), 272 B.R. 815, 821-22 (1st Cir. B.A.P. 2002)(per curiam)).

distress where there is no medical or other hard evidence to show something more than fleeting or inconsequential injury." <u>Stinson v. Bi-Rite Restaurant Supply, Inc. et al. (In re Stinson)</u>, 295 B.R. 109, 120 n. 8 (9th Cir. B.A.P. 2003)(internal quotations omitted), *aff'd in part, rev'd in part*, 128 Fed.Appx. 30 (9th Cir. 2005).[15] The reason why the courts have required the introduction of medical or other hard evidence in these types of cases is to ensure that the psychological injury is real- and not feigned- and to ensure that a cottage industry of filing questionable emotional distress claims does not clog the dockets of the courts. *See* , *e.g.*, <u>In re Stinson</u>, 295 B.R. at 119 (quoting the Seventh Circuit in <u>Aiello v. Providian Fin. Corp.</u>, 239 F.3d 876, 880-81 (7th Cir. 2001) and noting that the courts are concerned about the "potential for abuse" because "[emotional distress] [is] so easy to manufacture").

## VI.

In the Wingards' case, the Court finds that the debt collection activity of the Defendants is repugnant of our bankruptcy process.  However, the actions of the Defendants were not "patently egregious" to give rise to the presumption of emotional distress.

Under applicable law, fleeting or inconsequential injury is not actionable pursuant to 11 U.S.C. § 362(k)(1).  As a consequence, it was incumbent upon the

---

[15]  In <u>Stinson</u>, the Bankruptcy Appellate Panel for the Ninth Circuit held that emotional distress damages could be recovered only when such damages "piggy back" claims of financial loss as a result of a willful violation of the stay. <u>In re Stinson</u>, 295 B.R. at 120.  This aspect of <u>Stinson</u> was abrogated by the Ninth Circuit Court of Appeals in <u>Dawson</u>. <u>In re Dawson</u>, 390 F.3d at 1146-51.

Wingards to demonstrate to the Court in these proceedings that the Wingards suffered significant harm as a result of the Defendants' collection activity.

This Court holds that the Wingards have not met their burden of proof.  It is true that each of the Wingards testified generally that they did not sleep well, that they woke up nightly worrying about creditors, that they had elevated blood pressure, that their stomach was upset, and that there was friction in their marriage.  But they also testified that most, if not all, of these psychological and emotional elements existed in their lives prior to the bankruptcy and were carried over into the case.  No objective corroborating evidence was introduced into the record which the Court could conclude that the debtors have actually suffered significant mental distress at the hands of the Defendants.  In fact, the record is such that the anxiety and pressure suffered by the debtors is unfortunately inherent in the bankruptcy process.[16]

---

[16]   The Court does note for the record that the first dunning letter the Wingards received was dated March 29, 2007.  An unanswered question in this case is: If the Wingards' were so upset about the receipt of the dunning letters, why did they not respond to the letter until May 21, 2007 (which is approximately six weeks later)?

*[Remainder of Page Intentionally Left Blank]*

## VII.

For all of the reasons set forth above, the Court concludes that the Wingards have not met their burden of proof, and an Order will be entered in favor of the Defendants which dismisses this Adversary Proceeding with prejudice.  The Court, however, does reiterate that the conduct of the Defendants is repugnant to our system of bankruptcy.  As a result, and pursuant to 11 U.S.C. §§ 105(a) and 362(a), the Court will also enter an order which directs that the Defendants cease and desist all collection activity against the Wingards during the pendency of this case.  The failure of the Defendants to adhere to this order could result in the imposition of sanctions.

Date: March 6, 2008                    /s/ Jeffery A. Deller
                                       Jeffery A. Deller
                                       United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 06-70948-JAD |
| | ) | |
| SCOTT B. WINGARD and | ) | Chapter 13 |
| SHARON A. WINGARD, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ X | | |
| | ) | |
| SCOTT B. WINGARD and | ) | Adversary No. 07-07038-JAD |
| SHARON A. WINGARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ALTOONA REGIONAL HEALTH | ) | |
| SYSTEMS and CREDIT CONTROL | ) | |
| COLLECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ X | | |

**<u>ORDER</u>**

AND NOW, this <u>6th</u> day of <u>March, 2008</u>, and for the reasons set forth in the

Court's Memorandum Opinion issued herewith, the Court hereby ORDERS that:

1.  The Defendants CEASE AND DESIST all collection activity against the Wingards during the pendency of this case.  The failure of the Defendants to adhere to this order could result in the imposition of sanctions.

2.  This Adversary proceeding is DISMISSED with prejudice, with each party bearing their own costs, if any.   The Court retains jurisdiction regarding the enforcement of this order, to the

extent necessary.

Date: March 6, 2008        ___/s/ Jeffery A. Deller_____
                           Jeffery A. Deller
                           United States Bankruptcy Judge


CASE ADMINISTRATOR TO MAIL COPY TO:

cc: Mary Wheeler, Esquire (w/ Memorandum Opinion)
    A. Thomas Farrell, Esquire (w/ Memorandum Opinion)